UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ALABAMA
NORTHEASTERN DIVISION

| | |
|---|---|
| AMBER TURNER, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | Civil Action No. 5:19-CV-01772-CLS |
| ) | |
| MJTV, LLC d/b/a JIMMY'S ) | |
| LOUNGE; JAMES M. HOLT, and ) | |
| MICHAEL HOLT, ) | |
| ) | |
| Defendants. ) | |

| | |
|---|---|
| CHARLENE GDYNIA; JASHON ) | |
| JONES, ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| vs. ) | Civil Action No. 5:19-CV-01813-CLS |
| ) | |
| MJTV, LLC d/b/a JIMMY'S ) | |
| LOUNGE; JAMES M. HOLT, and ) | |
| MICHAEL HOLT, ) | |
| ) | |
| Defendants. ) | |

## MEMORANDUM OPINION

The plaintiffs in these consolidated actions — *i.e.*, Amber Turner, Charlene Gdynia, and Jashon Jones — assert claims under the Fair Labor Standards Act, 29 U.S.C. § 201 *et seq.*, against their former employers, MJTV, L.L.C. (the successor to JAH, L.L.C.), James M. Holt, and Michael Holt, all of whom conducted business in Huntsville, Alabama, under the trade name of "Jimmy's Lounge."[1]  This opinion

---

[1] *See* doc. no. 1 (Complaint) in 5:19-cv-1772-CLS, and doc. no. 1 (Complaint) in 5:19-cv-

addresses the plaintiffs' motion for partial summary judgment on the issue of liability. *See* doc. no. 24 (Plaintiffs' Motion for Partial Summary Judgment). Upon consideration of the motion, briefs, and evidentiary submissions, the court concludes that the motion should be granted.[2]

## I. STANDARD OF REVIEW

Federal Rule of Civil Procedure 56 provides that a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Supreme Court added a gloss to the language of that Rule, saying that summary judgment is proper "after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "In making this determination, the court must review all evidence and make all reasonable inferences

---

1813-CLS. Unless otherwise stated, all docket references going forward will be to 5:19-cv-1772-CLS, the lead case.

[2] Defendants filed a motion to extend their time to respond to plaintiffs' motion for partial summary judgment, and asking for an additional sixty days from May 15, 2020 (*i.e.*, until July 14, 2020). *See* doc. no. 27. However, the law clerk formerly responsible for monitoring this file and assisting the court failed to bring that motion to the attention of the undersigned. Consequently, it was not ruled upon, and defendants filed their response to plaintiffs' motion for partial summary judgment on May 15, 2020, thereby mooting the motion. In any event, the issues addressed in this opinion all turn upon questions of law, and are not fact dependent.

in favor of the party opposing summary judgment." *Chapman v. AI Transport*, 229 F.3d 1012, 1023 (11th Cir. 2000) (*en banc*) (quoting *Haves v. City of Miami*, 52 F.3d 918, 921 (11th Cir. 1995)). Inferences in favor of the non-moving party are not unqualified, however. "[A]n inference is not reasonable if it is only a guess or a possibility, for such an inference is not based on the evidence, but is pure conjecture and speculation." *Daniels v. Twin Oaks Nursing Home*, 692 F.2d 1321, 1324 (11th Cir. 1983) (alteration supplied). Moreover,

> [t]he mere existence of some factual dispute will not defeat summary judgment unless that factual dispute is *material* to an issue affecting the outcome of the case. The relevant rules of substantive law dictate the materiality of a disputed fact. A genuine issue of material fact does not exist unless there is sufficient evidence favoring the nonmoving party for a reasonable jury to return a verdict in its favor.

*Chapman*, 229 F.3d at 1023 (quoting *Haves*, 52 F.3d at 921) (emphasis and alteration supplied). *See also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986) (asking "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law").

## II. FACTS

Plaintiffs were employed as exotic dancers at Jimmy's Lounge, which defendants contend was owned and operated by the limited liability company known

as "JAH, L.L.C." until March 21, 2018. The sole owner and member of that limited liability company was defendant James M. Holt.[3] On March 21, 2018, however, defendants contend that the limited liability company known as "MJTV, L.L.C." assumed control and operation of Jimmy's Lounge.[4] The sole owner and member of that limited liability company was defendant Michael Holt, the son of defendant James M. Holt.[5] MJTV, L.L.C. operated Jimmy's Lounge from March 21, 2018 until the nightclub was closed in December 2019.[6]

While plaintiffs were employed as exotic dancers at Jimmy's Lounge, they were required to work at least four shifts each week, and at least one of those shifts had to be on a Friday or Saturday night.[7] They were expected to work either from noon until 6:00 p.m., or from 6:00 p.m. until 2:00 a.m.,[8] and they were fined for arriving late or departing early[9] in accordance with the following posted policies:

> All Contractors [*the term used by defendants to refer to plaintiffs*

---

[3] *See* doc. no. 28 (Defendants' Response). *See also* doc. no. 28-1 (James M. Holt Declaration), ¶ 2.

[4] Doc. no. 28 (Defendants' Response), ¶ 4; doc. no. 28-2 (Michael Holt Declaration), ¶¶ 3-4.

[5] Doc. no. 28 (Defendants' Response), ¶ 3; doc. no. 28-2 (Michael Holt Declaration), ¶ 2.

[6] Doc. no. 28-2 (Michael Holt Declaration), ¶ 4.

[7] Doc. no. 25-3 (Amber Turner Declaration), ¶ 4; doc. no. 25-4 (Charlene Gdynia Declaration), ¶ 4; doc. no. 25-5 (Jashon Jones Declaration), ¶ 4.

[8] Doc. no. 25-3 (Amber Turner Declaration), ¶ 7; doc. no. 25-4 (Charlene Gdynia Declaration), ¶ 7; doc. no. 25-5 (Jashon Jones Declaration), ¶ 7.

[9] Doc. no. 25-3 (Amber Turner Declaration), ¶ 4; doc. no. 25-4 (Charlene Gdynia Declaration), ¶ 4; doc. no. 25-5 (Jashon Jones Declaration), ¶ 4; doc. no. 29-1 (Justin Sullivan Declaration), ¶ 6.

> *and all other exotic dancers*] are to be dressed and on the floor when their shift starts (12 noon on dayshift, 6PM on nightshift).  A $10 fine will be applied for every hour that you are late.
>
> On <u>Monday-Wednesday</u> All nightshift Contractors are to be on the floor by <u>8PM</u> or you <u>must</u> pay your house fee <u>when you arrive</u> or you CAN NOT work.
>
> On the <u>Weekend</u> all nightshift contractors must be here by <u>9:30PM</u> or you <u>must</u> pay $75 dollars at the door <u>when you arrive</u> to work.
>
> NO EXCEPTIONS to any rules if rules are broken your house fees can be increased up to $250 or <u>it can result in a termination of contract.</u>

Doc. no. 25-6 (Rules), at 3 (*italicized alteration* supplied, all-caps and <u>underscored emphasis</u> in original).  Fines for departing early were due at the beginning of the dancer's next shift.[10]

Dancers were required to pay a "tip out" or "house fee" after each shift, usually in the amount of $25 dollars, but the amount increased to $35 dollars on weekends.[11] (Defendants dispute that a house fee was required for each shift, and state that the dancers were only charged such a fee if they used items supplied by Jimmy's Lounge, such as make-up, tape, or feminine hygiene products.[12])  Dancers also were required

---

[10] *See* doc. no. 25-3 (Amber Turner Declaration), ¶ 8; doc. no. 25-4 (Charlene Gdynia Declaration), ¶ 8; doc. no. 25-5 (Jashon Jones Declaration), ¶ 8.

[11] Doc. no. 25-3 (Amber Turner Declaration), ¶ 5; doc. no. 25-4 (Charlene Gdynia Declaration), ¶ 5; doc. no. 25-5 (Jashon Jones Declaration), ¶ 5; doc. no. 29-1 (Justin Sullivan Declaration), ¶ 6. *See also id.* ¶ 8 ("The tip out was not optional.").

[12] *See* doc. no. 28 (Defendants' Response), at 6; doc. no. 28-1 (James M. Holt Declaration),

to pay the disc jockey an amount that varied between $10 and $15 dollars.[13] Payments to the disc jockey were enforced in the same manner as "tip outs."[14]

Jimmy's Lounge kept a log of the time each dancer arrived, and whether she paid her "tip out" or any required fine.[15] The log also was used by the disc jockey to announce the names of dancers who were going to perform on the different stages in the club.[16]

Dancers earned money in two ways: tips received from patrons while performing on stage; and payment for private dances.[17] Dancers usually received customer tips in amounts between $2 and $5 dollars while performing on stage,[18] while club customers were charged for private dances at the rate of $25 dollars per song: a price that was determined by Jimmy's Lounge.[19] At the conclusion of a

---

¶ 4; doc. no. 28-2 (Michael Holt Declaration), ¶ 5.

[13] Doc. no. 25-3 (Amber Turner Declaration), ¶ 12; doc. no. 25-4 (Charlene Gdynia Declaration), ¶ 12; doc. no. 25-5 (Jashon Jones Declaration), ¶ 12; doc. no. 29-1 (Justin Sullivan Declaration), ¶ 9.

[14] Doc. no. 29-1 (Justin Sullivan Declaration), ¶ 9.

[15] Doc. no. 25-3 (Amber Turner Declaration), ¶ 9; doc. no. 25-4 (Charlene Gdynia Declaration), ¶ 9; doc. no. 25-5 (Jashon Jones Declaration), ¶ 9; doc. no. 29-1 (Justin Sullivan Declaration), ¶ 7.

[16] Doc. no. 25-3 (Amber Turner Declaration), ¶ 9; doc. no. 25-4 (Charlene Gdynia Declaration), ¶ 9; doc. no. 25-5 (Jashon Jones Declaration), ¶ 9.

[17] Doc. no. 25-3 (Amber Turner Declaration), ¶ 10; doc. no. 25-4 (Charlene Gdynia Declaration), ¶ 10; doc. no. 25-5 (Jashon Jones Declaration), ¶ 10.

[18] Doc. no. 25-3 (Amber Turner Declaration), ¶ 10(a); doc. no. 25-4 (Charlene Gdynia Declaration), ¶ 10(a); doc. no. 25-5 (Jashon Jones Declaration), ¶ 10(a).

[19] Doc. no. 25-3 (Amber Turner Declaration), ¶ 10(b); doc. no. 25-4 (Charlene Gdynia Declaration), ¶ 10(b); doc. no. 25-5 (Jashon Jones Declaration), ¶ 10(b). *See also* doc. no. 25-6

private dance, dancers were required to pay $5 of the $25 dollar charge to Jimmy's Lounge.[20]  Failure to pay that amount to the Lounge would result in the dancer's "house fees being increased from anywhere to as high as $250.00."  Doc. no. 25-6 (Dance Booth Rules), at 4.  Each plaintiff testified that, on more than one occasion, she personally witnessed the termination of dancers who attempted to avoid paying that fee.[21]  (Defendants contend that the $5 dollar payment was the Lounge's charge for each private dance customer, while the $20 dollars kept by the dancers was their "tip."[22])

Jimmy's Lounge controlled when dancers could perform private dances by mandating when each appeared on stage.[23]  The Lounge also set a "Dress Code" for the dancers' wardrobe and make-up, and conducted make-up checks before each performer stepped on stage.[24]  If dancers did not adhere to the dress code, they would

---

(Dance Booth Rules), at 4; doc. no. 29-1 (Justin Sullivan Declaration), ¶ 11.

[20] Doc. no. 25-3 (Amber Turner Declaration), ¶ 10(b); doc. no. 25-4 (Charlene Gdynia Declaration), ¶ 10(b); doc. no. 25-5 (Jashon Jones Declaration), ¶ 10(b); doc. no. 29-1 (Justin Sullivan Declaration), ¶ 12.

[21] Doc. no. 25-3 (Amber Turner Declaration), ¶ 11; doc. no. 25-4 (Charlene Gdynia Declaration), ¶ 11; doc. no. 25-5 (Jashon Jones Declaration), ¶ 11.

[22] Doc. no. 28-1 (James M. Holt Declaration), ¶ 5; doc. no. 28-2 (Michael Holt Declaration), ¶ 6.

[23] Doc. no. 25-3 (Amber Turner Declaration), ¶ 13; doc. no. 25-4 (Charlene Gdynia Declaration), ¶ 13; doc. no. 25-5 (Jashon Jones Declaration), ¶ 13.

[24] Doc. no. 25-3 (Amber Turner Declaration), ¶ 14; doc. no. 25-4 (Charlene Gdynia Declaration), ¶ 14; doc. no. 25-5 (Jashon Jones Declaration), ¶ 14.  *See also* doc. no. 25-6 (Dress Code), at 5.

not be allowed to perform.[25]

Plaintiffs did not receive W-2 or 1099 forms from Jimmy's Lounge,[26] even though defendants required dancers during the Summer of 2018 to fill out W-4 forms, and instituted a system that required each performer to "clock in" and "clock out" of work.[27] Plaintiffs were told they would be paid a minium wage at the reduced tipped rate per hour.[28] However, Jimmy's Lounge quickly ceased paying attention to whether plaintiffs clocked in or out, and never issued any paychecks to plaintiffs.[29] Plaintiffs also never received any report of the hours each worked.[30] Whenever a dancer complained about the missing paychecks or lack of information, Jimmy's Lounge would cut them a check for "some round figure, like $50.00, to silence the dancer." Doc. no. 25-3 (Amber Turner Declaration), ¶ 18.[31]

---

[25] *See* doc. no. 25-3 (Amber Turner Declaration), at 12 (Dress Code).

[26] Doc. no. 25-3 (Amber Turner Declaration), ¶ 16; doc. no. 25-4 (Charlene Gdynia Declaration), ¶ 16; doc. no. 25-5 (Jashon Jones Declaration), ¶ 16.

[27] Doc. no. 25-3 (Amber Turner Declaration), ¶ 17; doc. no. 25-4 (Charlene Gdynia Declaration), ¶ 17; doc. no. 25-5 (Jashon Jones Declaration), ¶ 17.

[28] Doc. no. 25-3 (Amber Turner Declaration), ¶ 18; doc. no. 25-4 (Charlene Gdynia Declaration), ¶ 18; doc. no. 25-5 (Jashon Jones Declaration), ¶ 18.

[29] Doc. no. 25-3 (Amber Turner Declaration), ¶¶ 17-18; doc. no. 25-4 (Charlene Gdynia Declaration), ¶¶ 17-18; doc. no. 25-5 (Jashon Jones Declaration), ¶¶ 17-18. *See also* doc. no. 29-1 (Justin Sullivan Declaration), ¶ 15 ("The time card system they used to record time and pay for the dancers was used haphazardly at best. . . . The Club never paid those dancers regularly. I literally threw some punch cards in the trash at the direction of Michael Holt.").

[30] Doc. no. 25-3 (Amber Turner Declaration), ¶ 19; doc. no. 25-4 (Charlene Gdynia Declaration), ¶ 19; doc. no. 25-5 (Jashon Jones Declaration), ¶ 19.

[31] *See also* doc. no. 25-4 (Charlene Gdynia Declaration), ¶ 18 (same); doc. no. 25-5 (Jashon Jones Declaration), ¶ 18 (same).

### III.  DISCUSSION

Section 206 of the Fair Labor Standards Act ("FLSA") requires employers to pay all covered employees at least a statutorily-prescribed minimum wage for each hour worked.  29 U.S.C. § 206(a)(1).  Section 216(b) provides the following remedy for violation of that provision:  "Any employer who violates the provisions of section 206 . . . shall be liable to the employee or employees affected in the amount of their unpaid minimum wages . . . and in an additional equal amount as liquidated damages."  29 U.S.C. § 216(b).

Plaintiffs allege they were inappropriately categorized as "independent contractors," as opposed to "employees."  In order to "determine whether an individual falls into the category of covered 'employee' or exempted 'independent contractor,' courts look to the 'economic reality' of the relationship between the alleged employee and alleged employer and whether that relationship demonstrates dependence."  *Scantland v. Jeffry Knight, Inc.*, 721 F.3d 1308, 1311 (11th Cir. 2013).  The so-called "economic reality test" relied upon by the Eleventh Circuit has six factors:  *i.e.*,

    (1)    the nature and degree of the alleged employer's control as to the manner in which the work is to be performed;

    (2)    the alleged employee's opportunity for profit or loss depending upon his managerial skill;

> (3) the alleged employee's investment in equipment or materials required for his task, or his employment of workers;
>
> (4) whether the service rendered requires a special skill;
>
> (5) the degree of permanency and duration of the working relationship;
>
> (6) the extent to which the service rendered in an integral part of the alleged employer's business.

*Id.* at 1312. While the foregoing factors serve as guides for decision-making, "the overarching focus of the inquiry is economic dependence." *Id.*

The Eleventh Circuit has not yet addressed the specific question of whether exotic dancers are covered employees under the Fair Labor Standards Act. Even so, the Fifth Circuit and a number of district courts have done so and, without exception, those courts have found an employment relationship and required the nightclub to pay its dancers a minimum wage. *Reich v. Circle C. Investments, Inc.*, 998 F.2d 324 (5th Cir. 1993) (finding dancers to be "employees" under FLSA); *Harrell v. Diamond A Entertainment, Inc.*, 992 F. Supp. 1343, 1348 (M.D. Fla. 1997) (same); *Reich v. Priba Corp.*, 890 F. Supp. 586 (N.D. Tex. 1995) (same); *Martin v. Circle C Investments, Inc.*, No. MO-91-CA-43, 1991 WL 338239 (W.D. Tex. Mar. 27, 1991) (same).[32]

---

[32] *See also, e.g.*, *Hart v. Rick's Cabaret International, Inc.*, 967 F. Supp. 2d 901 (S.D. N.Y. 2013); *Thornton v. Crazy Horse, Inc.*, No. 3:06-cv-00251-TMB, 2012 WL 2175753 (D. Alaska June 14, 2012); *Clincy v. Galardi South Enterprises, Inc.*, 808 F. Supp. 2d 1326 (N.D. Ga. 2011); *Thompson v. Linda and A. Inc.*, 779 F. Supp. 2d 139 (D. D.C. 2011); *Morse v. Mer Corp.*, No. 1:08-cv-1389-WTL-JMS, 2010 WL 2346334 (S.D. Ind. June 4, 2010).

In like manner, and for the reasons discussed below, this court also finds that the factors of the "economic reality" test are met, and that plaintiffs are covered "employees" under the FLSA, as opposed to independent contractors.

First, defendants exercised control over the manner in which plaintiffs performed their work. For example, defendants:

> determined the order in which each dancer appeared on stage and, consequently, when she was available to perform private dances;[33]
>
> determined when and for how long each dancer performed;[34]
>
> controlled the music played by the disc jockey, to which the performers danced;[35]
>
> required dancers to pay the disc jockey;
>
> controlled the clothes, make-up, and shoes worn by each dancer;[36]
>
> mandated the amount of "house fees" or "tip outs"; and,
>
> set the rate that each performer could charge for a private dance.[37]

Other courts have found the "control factor" to have been met under similar

---

[33] *See* doc. no. 25-6 (Stage rules), at 2 ("Be on stage within 30 seconds of being called or you will be written up"); doc. no. 25-3 (Amber Turner Declaration), ¶ 13; doc. no. 25-4 (Charlene Gdynia Declaration), ¶ 13; doc. no. 25-5 (Jashon Jones Declaration), ¶ 13.

[34] *See* doc. no. 25-3 (Amber Turner Declaration), ¶¶ 4-8; doc. no. 25-4 (Charlene Gdynia Declaration), ¶¶ 4-8; doc. no. 25-5 (Jashon Jones Declaration), ¶¶ 4-8.

[35] *See* doc. no. 25-6 (Stage Rules), at 2 ("Dance to what the DJ plays. They are provided a Jimmy's program of music and what the DJ must play.").

[36] *See* doc. no. 25-6 (Dress Code), at 5.

[37] *See* doc. no. 25-3 (Amber Turner Declaration), ¶¶ 5, 10(b)-12; doc. no. 25-4 (Charlene Gdynia Declaration), ¶¶ 5, 10(b)-12; doc. no. 25-5 (Jashon Jones Declaration), ¶¶ 5, 10(b)-12.

circumstances. *See, e.g.*, *Dean v. 1715 Northside Drive, Inc.*, 224 F. Supp. 3d 1302, 1320 (N.D. Ga. 2016) (finding the control factor met where the club charged "stage rental fees" and set the minimum amount dancers could charge for private dances); *Degidio v. Crazy Horse Saloon and Restaurant, Inc.*, No. 4:13-cv-02136-BHH, 2015 WL 5834280, at *8-12 (D. S.C. Sept. 30, 2015) (finding the control factor met where the club controlled the entertainers' dress and sequence of performance, required the entertainers to sign in and pay house fees, and set minimum prices for private dances). Accordingly, the first factor of the economic reality test is satisfied.

Neither party explicitly addressed the second factor. Even so, like the Northern District of Georgia in *Clincy v. Galardi South Enterprises, Inc.*, 808 F. Supp. 2d 1326 (N.D. Ga. 2011), this court is "not aware of any decision in which a court found that an exotic dancer has significant control over her opportunity for profit or loss relative to the club at which she works." *Id.* at 1345.

Similarly, and addressing the third factor of the economic reality test, other courts have found that a nightclub's investment is far greater than the relative investment of dancers. *See, e.g.*, *Hart v. Rick's Cabaret International, Inc.*, 967 F. Supp. 2d 901, 920 (S.D. N.Y. 2013) ("[E]xotic dancers are 'far more closely akin to wage earners toiling for a living, than to independent entrepreneurs seeking a return on their risky capital investments.'") (quoting *Reich v. Circle C. Investments, Inc.*,

998 F.2d 324, 328 (5th Cir. 1993)); *Clincy*, 808 F. Supp. 2d at 1346-47 (finding that plaintiffs' investment in personal grooming and wardrobe did not equate to the defendant's investment in the nightclub through ownership of a liquor license, lease of the club's fixtures, and maintenance of the facilities). The same is true here, where defendants leased the space, operated the business, grossed more than $500,000 in annual revenue, and incurred all of the risk and reward for operation of the lounge.

The fourth factor is easily met, because no formal training is required for exotic dancers.[38] *See Degidio*, 2015 WL 5834280, at *13 ("[I]t appears the only qualification required [for exotic dancing] is a willingness to take one's clothes off. . . . Like others, this Court declines to characterize this as a 'skill.'") (alteration supplied); *Mason v. Fantasy, LLC*, No. 13-cv-02020-RM-KLM, 2015 WL 4512327, at *10 (D. Colo. July 27, 2015) ("Courts have held that there is little to no skill required to be a nude dancer."); *Stevenson v. Great American Dream, Inc.*, No. 1:12-cv-3359-TWT, 2013 WL 6880921, at *5 (N.D. Ga. Dec. 31, 2013) ("Taking your clothes off on a nightclub stage and dancing provocatively are not the kinds of special skills that suggest independent contractor status.").

The fifth economic reality test factor involves consideration of "the degree of permanency and duration of the working relationship." *Scantland*, 721 F.3d at 1312.

---

[38] Doc. no. 25-3 (Amber Turner Declaration), ¶ 21; doc. no. 25-4 (Charlene Gdynia Declaration), ¶ 21; doc. no. 25-5 (Jashon Jones Declaration), ¶ 21.

Amber Turner performed as an exotic dancer at Jimmy's Lounge at various times after 2011, but consistently from January 2017 to April 2019.[39] Charlene Gdynia and Jashon Jones performed at various times after 2009, but consistently from November 2016 to October 2019.[40] While such patterns do not demonstrate employment permanency, they show that all plaintiffs worked at Jimmy's Lounge for considerable periods of time. Further, many of the courts that found exotic dancers to be "employees" for purposes of the FLSA "did so despite finding the employment relationship lacked a high degree of permanence." *Thompson v. Linda and A., Inc.*, 779 F. Supp. 2d 139, 150 (D. D.C. 2011). *See also, e.g.*, *Reich*, 998 F.2d at 328-29 ("The transient nature of the work force is not enough here to remove the dancers from the protections of the FLSA."); *McFeeley v. Jackson Street Entertainment, LLC*, 47 F. Supp. 3d 260, 272-73 (D. Md. 2014) ("The lack of permanence in the relationship between the clubs and the dancers is not outcome determinative in the overall determination of whether the dancers were employees of the clubs."). Since each of the plaintiffs worked at Jimmy's Lounge for extended periods of time, the fifth factor is satisfied.

Finally, the services provided by exotic dancers are clearly integral to a

---

[39] Doc. no. 25-3 (Amber Turner Declaration), ¶ 1.

[40] Doc. no. 25-4 (Charlene Gdynia Declaration), ¶ 1; doc. no. 25-5 (Jashon Jones Declaration), ¶ 1.

"Gentleman's Club," such as Jimmy's Lounge. *See, e.g.*, *Hart*, 967 F. Supp. 2d at 921 ("No reasonable jury could conclude that exotic dancers were not integral to the success of a club that marketed itself as a club for exotic dancers."); *Harrell*, 992 F. Supp. at 1352 ("Exotic dancers are obviously essential to the success of a topless nightclub.").

Thus, plaintiffs were "employees" entitled to receive a minimum wage under the FLSA. Even if the factors of the "economic reality" test had not been so clearly met, defendants waived the argument, because they did not dispute that plaintiffs were employees. Instead, they denied only plaintiffs' contention that they were not paid at least the minimum wage while employed at Jimmy's Lounge.[41] That issue does not relate to the question of liability, however, but only to the amount of damages that plaintiff may recover.

Another issue is whether defendants violated the FLSA by wrongfully confiscating plaintiffs' tips by forcing each to pay defendants "tip outs," portions of their private dance fees, and disc jockey fees. Under the Act, "[a]n employer may not keep tips received by its employees for any purposes, including allowing managers or supervisors to keep any portion of employees' tips, regardless of whether or not the employer takes a tip credit." 29 U.S.C. § 203(m)(2)(B). Additionally, employers

---

[41] *See* doc. no. 28 (Defendants' Response), at 6.

cannot require that employees pay "kick-backs."

> Whether in cash or in facilities, "wages" cannot be considered to have been paid by the employer and received by the employee unless they are paid finally and unconditionally or "free and clear." The wage requirements of the Act will not be met where the employee "kicks-back" directly or indirectly to the employer or to another person for the employer's benefit the whole or part of the wage delivered to the employee. This is true whether the "kick-back" is made in cash or in other than cash. For example, if it is a requirement of the employer that the employee must provide tools of the trade which will be used in or are specifically required for the performance of the employer's particular work, there would be a violation of the Act in any workweek when the cost of such tools purchased by the employee cuts into the minimum or overtime wages required to be paid him under the Act.

29 C.F.R. § 531.35. Defendants do not dispute plaintiffs' contention that each was required to pay disc jockeys at the end of each shift, nor do they dispute that such payments were illegal kick-backs under 29 C.F.R. § 531.35. Accordingly, any such argument is waived.

Defendants also do not deny that plaintiffs were charged a "house fee." Instead, they dispute the nature of that fee. Defendants claim that Jimmy's Lounge only charged dancers a house fee if they used supplies provided by the club, such as "make-up, tape, personal/feminine hygiene products, etcetera." Doc. no. 28 (Defendants' Response), at 6. If defendants' claim is factual, the charge likely would still be considered an illegal kick-back during the weeks in which it "cut[ ] into the minimum or overtime wages required to be paid" to plaintiffs. 29 C.F.R. § 531.35.

16

Accordingly, the question of the amount, if any, of such fee to be awarded plaintiffs will be left for determination of the amount of damages.

Finally, plaintiffs contend that the $5 dollar amounts collected by defendants for each private dance is an illegal confiscation of a tip. Defendants dispute, however, that those amounts were considered to be "tips." Instead, they categorize the $5 dollar amounts as the rate charged each customer by Jimmy's Lounge for private dances. *See* doc. no. 28 (Defendants' Response), at 6. That question has been litigated extensively, and the law does not support defendants' contention.

> Department of Labor regulations define a service charge as a "compulsory charge for service . . . imposed on the customer by an employer's establishment." 29 C.F.R. § 531.55(a). Several federal courts have considered the question specifically at issue here: whether private dance fees can be credited toward a club's minimum wage and overtime obligations as service charges. Courts have consistently found that the law imposes two requirements for an employer to claim this credit. *First, the employer must include the service charge in its gross receipts. Second, the employer must distribute the service charge to its employees.* . . . As Judge J. Harvie Wilkinson explained in his recent opinion, "[t]hese requirements are necessary to ensure that employees actually received the service charges as part of their compensation as opposed to relying on the employer's assertion or say-so." *McFeeley* [*v. Jackson Street Entertainment, LLC,*] 825 F.3d [235,] 246 [(4th Cir. 2016)].

*Verma v. 3001 Castor, Inc.*, No. 13-3034, 2016 WL 6962522, at *6 (E.D. Pa. Nov. 29, 2016) (emphasis supplied). *See also, e.g., McFeeley*, 825 F.3d at 246; *Henderson v. 1400 Northside Drive, Inc.*, 110 F. Supp. 3d 1318, 1322 (N.D. Ga. 2015); *Hart*, 967

F. Supp. 2d at 929.  It does not appear that either of those requirements have been met.  Neither party has filed as evidence defendants' gross receipts, but the evidence presented shows that plaintiffs received the private dance fees directly, and then paid $5 dollars to Jimmy's Lounge.[42]  Accordingly, that payment cannot be categorized as a "service charge," and must be accounted for in the damages calculation.

### IV.  CONCLUSION AND PARTIAL JUDGMENT ON THE ISSUE OF DEFENDANTS' LIABILITY

In accordance with the foregoing, the court concludes that plaintiffs' motion for summary judgment is due to be, and it hereby is, GRANTED.  Accordingly, it is CONSIDERED, ORDERED, and DECREED that judgment on the issue of liability be, and the same hereby is, entered in favor of plaintiffs, Amber Turner, Charlene Gdynia, and Jashon Jones, and against defendants, MJTV, L.L.C. (the successor to JAH, L.L.C.), James M. Holt, and Michael Holt, all of whom conducted business in Huntsville, Alabama, under the trade name of "Jimmy's Lounge."  Plaintiffs will be granted leave to prove damages.

A separate order setting a date and time for pretrial conference on the issue of the amount of damages to be awarded plaintiffs shall be entered contemporaneously herewith.

---

[42] Doc. no. 25-3 (Amber Turner Declaration), ¶ 10(b); doc. no. 25-4 (Charlene Gdynia Declaration), ¶ 10(b); doc. no. 25-5 (Jashon Jones Declaration), ¶ 10(b); doc. no. 29-1 (Justin Sullivan Declaration), ¶ 12.

**DONE** and **ORDERED** on this, the 23nd day of July, 2020.

*/s/ Lynwood Smith*
_____
Senior United States District Judge